## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**AKIL CHILDRESS, et al.,**

      **Plaintiffs,**

        **v.**

**CITY OF CINCINNATI, OHIO, et al.,**

      **Defendants.**

**Case No. 1:24-cv-214**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

Urban revitalization efforts often spawn dissenting voices. Rising property values sound good in the abstract, but sometimes questions arise as to who is capturing that increased value—current owners or savvy (and potentially well-connected) developers? And what techniques is the government using to free up land for redevelopment? Are those techniques coercive? Or is the government applying them in an equitable manner? In that vein, the Complaint here alleges a sprawling scheme of unlawful land redevelopment practices among the City of Cincinnati (the City), Port of Greater Cincinnati Development Authority (the Port), Hamilton County Land Reutilization Corporation (HCLRC), Cincinnati Center City Development Corporation (3CDC), and various individuals (collectively Defendants) in connection with efforts to revitalize the Over-The-Rhine and Mt. Auburn communities in Cincinnati. Specifically, the Plaintiffs allege that Defendants attempted to drive African American owners and residents away from these areas through predatory and discriminatory enforcement of building codes and similar government

regulations. Several Defendants—(1) the City, (2) the Port along with HCLRC, and (3) 3CDC—filed Motions to Dismiss (Docs. 83, 84, 86) on behalf of their respective entities and the Individual Defendants[1] associated with each entity (collectively the Moving Defendants). For the reasons below, the Court **GRANTS** the Moving Defendants' motions and **DISMISSES** the claims against them, some claims **WITH PREJUDICE** and some **WITHOUT PREJUDICE**.

## BACKGROUND[2]

Plaintiffs Akil Childress, Emma Sue Long, Charlene Berkhalter, Sandra Allen, James McCrary, Vanessa Sparks, Stanford Poole, Denise Hill, Rodney Thompson, and Omar Childress[3] (collectively Plaintiffs) are all African Americans who own or owned property in Cincinnati, Ohio. (Compl., Doc. 1, #18, 29–30). They bring this lawsuit against seventy-two Defendants.[4] (*Id.* at #18–22). Because of the number of Defendants, the Court starts by laying some groundwork. Plaintiffs sue four entities: the City, the Port, HCLRC, and 3CDC. (*Id.* at #18–22). The other sixty-eight

---

[1] "Individual Defendant" refers to any individual person named in this lawsuit and covered by one of the three motions to dismiss—i.e., any City executive, employee, or councilmember; any Port executive or employee; any HCLRC board member; and any 3CDC employee.

[2] As this matter is before the Court on the Moving Defendants' motions to dismiss, the Court generally must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But the Court reminds the reader that they are just that—allegations.

[3] The Complaint's caption does not list Omar Childress as a Plaintiff. But he is listed as one in the "Parties" section. (Doc. 1, #18). So the Court accepts that he is in fact a Plaintiff.

[4] That's how many Defendants the Complaint's caption lists anyway. (*See* Doc. 1, #2–17). The City's motion apparently applies to Councilmember Anna Albi, (Doc. 83, #280), who is not named in the Complaint's caption but is named in the "Parties" section. (*Id.* at #18). And the City's motion also applies to Inspector Greg Wiles, (Doc. 83, #280), whom the Complaint does not name at all, but who could be one of the "Other Unnamed Building Inspectors" that the Complaint does name, (Doc. 1, #8).

Defendants are individuals, many (but apparently not all) of whom are associated with one of those four entities. (*Id.*). As evidenced by the three motions to dismiss, the Moving Defendants have grouped themselves into three categories: (1) the City and its executives, councilmembers, and employees, (2) the Port, its executives and employees, along with HCLRC (which the Port manages), and appointed (non-elected) members of HCLRC's Board of Directors,[5] and (3) 3CDC and its employees. (*See* City Mot. to Dismiss, Doc. 83; 3CDC Mot. to Dismiss, Doc. 84; Port Mot. to Dismiss, Doc. 86). Plaintiffs also sue various Hamilton County elected officials, including Board of Commissioners members, the County Treasurer, and the County Auditor.[6] (Doc. 1, #15–16).

---

[5] Because the Port is HCLRC's management company, those two entity-Defendants jointly moved to dismiss. (Doc. 86). So whenever the Court refers to the Port it likewise refers to HCLRC, unless otherwise specified.

[6] The Court is uncertain how it should treat these Hamilton County officials, which include Commissioner Denise Driehaus, Commissioner Alicia Reese, Commissioner Stephanie Summerow Dumas, County Treasurer Jill Schiller, and County Auditor Dusty Rhodes (which the Complaint twice misspells as "Rhode"). (Doc. 1, #15–16). In the Complaint's caption, Plaintiffs seem to affiliate Driehaus, Reese, Dumas, and Schiller with HCLRC by listing "Hamilton County Land Reutilization Corporation" and HCLRC's address under their names. But the Port's motion to dismiss (which applies to HCLRC) clarifies that it applies only to *non-elected* HCLRC members. (Doc. 86, #687). HCLRC board members who double as Hamilton County elected officials (which would presumably include those four individuals), by contrast, "are separately represented by their respective government attorneys. To the extent they have been named *solely* in their capacity as HCLRC board members, [the Port's motion] should be deemed to apply to them as well." (*Id.* at #687 n.2 (emphasis added)). The Court, however, isn't sure whether those individuals are being sued solely in their capacities as HCLRC board members. Indeed, the Complaint, in naming those individuals, lists their titles as elected officials alongside their names. But as far as the Court can tell, no government attorney has filed a motion representing these elected officials. So the Court cannot determine whether the Port's motion applies to them, or not. Further complicating matters, the Complaint does not at all affiliate Rhodes, the County Auditor, with HCLRC. So it would seem that the Port's motion does not apply to him.

The Court notes further confusion as to Defendants Bill Hern, Mike Fehn, Sean Minihan, Terry James, David Schneider, Dave Longhom (which the Complaint alternatively spells

A little more background before turning to the allegations. The City is a municipal corporation within Ohio. (*Id.* at #18). The Port is a public agency, organized under Ohio Revised Code Chapter 4582, that engages in real estate development in Cincinnati. (*Id.* at #19; Doc. 86, #686). The Port manages HCLRC, which is a non-profit corporation, organized under Ohio Revised Code Chapter 1702 and 1724, that facilitates the reutilization of nonproductive land in Cincinnati. (Doc. 1, #22; Doc. 86, #686). Finally, 3CDC is a private, non-profit corporation whose stated mission is to strengthen downtown Cincinnati's core assets "by revitalizing and connecting the Central Business District and Over-the-Rhine (OTR)." (Doc. 1, #19–20).

Now for Plaintiffs' allegations. While they are somewhat cryptic, at bottom, Plaintiffs claim that the City has selectively enforced its building code against African American-owned properties, and that it did so to allow the Port and 3CDC to acquire

---

"Longham"), Aaron Ice, and "Other Unnamed Building Inspectors," all of whom Plaintiffs associate with the City's Buildings and Inspections Department. (Doc. 1, #6–8). Although the City's motion purports to apply to the Buildings and Inspections Department's Director Art Dahlberg, Deputy Director Ed Cunningham, Inspector Kevin Rhodes, and Inspector Greg Wiles, it does not claim to apply to the other eight Defendants allegedly affiliated with the Buildings and Inspections Department. (*See* Doc. 84, #280). Nor do the other two motions filed. (*See generally* Docs. 84, 86). The City's motion does suggest that Defendant Dave Longhom is now deceased, and that Defendant Aaron Rice is a former City inspector, which perhaps explains why it does not apply to those individuals. (Doc. 84, #288). As for the other Defendants, though, the Court is left to guess. Summons were returned executed as to Defendants Fehn, Minihan, James, Schneider, Longhom, Ice, and the Other Unnamed Building Inspectors, (Docs. 73-20, 73-21, 73-22, 73-38, 73-39, 73-40), but not as to Defendant Hern.

Given the confusion, the Court intends to set a telephonic status conference with the Plaintiffs and all the above-named Defendants after this Opinion and Order issues. Further, for purposes of this Opinion and Order, the Defendants listed above are not included in Moving Defendants.

those properties, sell them at below-market prices, and force African Americans out of their communities, all in the name of land redevelopment. (Doc. 1, #23–29).

The alleged scheme goes something like this. The City directs its Building and Inspections Department to initiate building code complaints against African American-owned properties in Cincinnati's OTR and Mt. Auburn neighborhoods. (*Id.* at #27). After lodging a complaint, the City's inspectors then inspect the property and either declare the building vacant or a public nuisance. (*Id.* at #27, 29). If the property is deemed vacant, that, in turn, requires the property owner to obtain a "Vacant Building License," which he or she can acquire only after making any necessary repairs, or otherwise abating the nuisance. (*Id.* at #27). If the owner does not make the required repairs or abate the nuisance, the City runs up fines against the property and ultimately takes possession for re-sale to developers at below-market prices. (*Id.*). Enter the Port, which apparently purchases those vacant or foreclosed homes in the OTR and Mt. Auburn neighborhoods to create a real estate portfolio. (*Id.* at #23, 28). 3CDC, for its part, rounds out the scheme by acting as a receiver for properties in the Port's portfolio, thus removing those properties from the county real estate tax roll. (*Id.* at #24). After receiving the properties, 3CDC allegedly transfers the properties back to the Port, which resells them to private developers at below-market prices. (*Id.*).

According to Plaintiffs, the City memorialized at least part of this scheme in its February 8, 2017, Auburn Avenue Corridor Strategic Development Plan (the Plan), which sought to "[i]dentify and solicit development interests for possible

redevelopment opportunities" and "[p]romote continued success of The Christ Hospital"—a hospital in Mt. Auburn. (*Id.*). The City apparently developed the Plan after reviewing its Department of Building and Inspections records, which Plaintiffs say targeted single-family homes that the City ordered vacated for code violations. (*Id.* at #25). The map accompanying the Plan supposedly highlights the neighborhoods between and adjacent to the FC Cincinnati soccer stadium and The Christ Hospital—which includes OTR and Mt. Auburn—as those that Defendants are targeting in their redevelopment scheme. (*Id.* at #24–25). Plaintiffs further allege that, after providing millions in taxpayer dollars to help build FC Cincinnati's stadium in November 2017, the City rezoned the areas around the future stadium's site from mostly residential to "urban mix," which permitted entertainment facilities and restaurants to open in those neighborhoods. (*Id.* at #25). The City codified that rezoning decision on March 21, 2018, in Ordinance 54-2018. (*Id.* at #26). FC Cincinnati (which, to be clear, is not a named Defendant in this case) apparently plans to continue gentrifying the area surrounding its new stadium by displacing minority and low-income residents and business, including Plaintiffs. (*Id.*). And Plaintiffs claim that the City, the Port, and HCLRC are all aware of FC Cincinnati's discriminatory plans but still ratify its activities through the discriminatory scheme outlined above. (*Id.*).

Plaintiffs each claim to have fallen victim to Defendants' scheme, as the City has cited each of their properties for code violations or declared them public nuisances. (*Id.* at #29). As a result, Plaintiffs have allegedly "received dozens of

6

unsolicited and aggressive offers from real estate developers to purchase their properties." (*Id.*). Plaintiffs Omar Childress and Stanford Poole even allege that Defendants have jailed them for their housing violations, although they are remarkably light on specifics about that. (*Id.* at #33, 35).

Unhappy with the alleged land redevelopment practices, Plaintiffs initiated this suit on April 19, 2024. The Complaint sets out six claims[7]—the first three sounding in the United States Constitution, the latter three sounding in "tort" (that's how the Moving Defendants label those claims in the motions to dismiss anyway—more on the specifics of those claims below). (*Id.* at #36–42). And for each claim, it names each Individual Defendant in his or her individual and official capacity. (*Id.* at #2–17).

Starting with the constitutional causes of action, the Complaint raises three claims against all Defendants under 42 U.S.C. § 1983.[8] First is a claim labeled "Deprivation of Equal Protection" for alleged violations of the Fourteenth Amendment (Count I). (*Id.* at #18, 36–37). Next is a "Deprivation of Property Rights Without Just Compensation or Due Process of Law" claim for violations of the Fifth and Fourteenth Amendments (Count II). (*Id.* at #18, 37–39). And finally, the third is a claim for "Conspiracy to Violate Civil Rights," based on the same Fourteenth

---

[7] As the parties noted in their briefing, Plaintiffs' Complaint labeled the final cause of action as the seventh cause of action. (Doc. 1, #41). But there are only six, (Doc. 1, #36–42; Doc. 89, #718), so the Court will refer to it as Count VI.

[8] The Complaint does not outrightly say that Counts I, II, and III arise under § 1983. But in its "Jurisdiction" section, it does say this action was brought "pursuant to §§ 1983 and 1988." (Doc. 1, #18). Since those three counts allege constitutional violations, the Court presumes that they arise under § 1983.

Amendment Equal Protection Clause rights that underlie Count I (Count III). (*Id.* at #18, 39).

Beyond the constitutional claims, the Complaint raises three additional claims against all Defendants, arising under statutory or common law. First, Plaintiffs assert a "Civil Conspiracy" claim under Ohio law (Count IV).[9] (*Id.* at #39–40). Next, Plaintiffs allege extortion under Ohio Revised Code § 2307.60 (Count V). (*Id.* at #40–41). And to round it out, the Complaint raises a claim for civil violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) under 18 U.S.C. §§ 1962, 1964, and 1965(a) (Count VI). (*Id.* at #18, 41–42).

The City, the Port (plus HCLRC), and 3CDC moved to dismiss all six counts, both on behalf of each respective entity itself and any Individual Defendants affiliated with that entity. (Docs. 83, 84, 86). Among the three motions, the Moving Defendants make various arguments about why the Court should dismiss each of Plaintiffs' claims.[10] As an initial matter, the City argues that some or all of Plaintiffs Sparks', Poole's, Thompson's, Hill's, McCrary's, and Allen's claims are doomed without even reaching the merits. As to Sparks', Poole's, Thompson's, and Hill's § 1983 claims (Counts I–III), that is due to the applicable statute of limitations. (Doc. 83, #293–94).

---

[9] Though the Complaint does not expressly say that Count IV arises under Ohio law, Plaintiffs' Response confirms that Ohio law applies to both Counts IV and V. (Doc. 89, #718).

[10] The Port incorporated the arguments made in the other two motions into its own. (Doc. 86, #685 ("For the reasons described below—and for those reasons urged by other Defendants, arguments that the Port Authority joins in full and incorporates by reference—Plaintiffs' Complaint should be dismissed with prejudice.")). So did 3CDC. (Doc. 84, #547 ("[T]he 3CDC Defendants incorporate herein the arguments made by the City Defendants and the Port Defendants in their Motions to Dismiss.")).

Meanwhile all of McCrary's claims, the City says, fail under *Rooker-Feldman*. (*Id.* at #294–95). Finally, the City argues that, as to Allen's claims, the Court should abstain under *Younger*. (*Id.* at #296–97). The Port, for its part, presses (seemingly as against all claims, both state and federal) an immunity argument, claiming that Ohio common law and Ohio Revised Code § 1702.55(A) prohibit Plaintiffs from imposing liability on the Port's and HCLRC's Individual Defendants "merely by virtue of their status as employees and board members."[11] (Doc. 86, #689–90).

Turning to the merits, each Moving Defendant makes slightly different arguments. Take the constitutional claims under § 1983 (Counts I–III), for example, and start with the City. It first maintains that Poole (mentioned above) along with any Plaintiffs as to whom the City did not make one or more of the threshold arguments above (i.e., Akil and Omar Childress, Long, and Berkhalter), all fail to sufficiently plead a § 1983 claim.[12] (Doc. 83, #297–300). The City next argues that Plaintiffs failed to sufficiently plead *Monell* liability, thus requiring the Court to

---

[11] Whether a person is liable for another's acts in violation of § 1983 is a matter of federal, not state, law. *See Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) (explaining that state-law defenses cannot immunize a defendant from a § 1983 claim). In any event, there is no derivative liability for individuals under § 1983. *Boles v. Haston*, 831 F.2d 293, 1987 WL 44466, at *1 n.2 (6th Cir. Oct. 5, 1987) (Table). Rather, a person is liable only for their own conduct. *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each [] defendant, through the [defendant's] own individual actions, has violated the Constitution."). So, the Port's argument that the Individual Port Authority Defendants are not "mentioned by name in the factual allegations ***at all***," (Doc. 86, #690 (emphasis in original)), would, if true, generally apply to the § 1983 claims against them, as well as the state-law claims.

[12] Somewhat oddly, for the Plaintiffs (other than Poole) as to whom the City moved to dismiss based on threshold issues (e.g., statute of limitations, *Rooker-Feldman*, or *Younger*), it appears the City does *not* also press, in the alternative, arguments directed to the merits of those Plaintiffs' claims. That is, as to Sparks, Thompson, Hill, McCrary, and Allen, the City's motion rises or falls on the threshold issues alone.

dismiss the § 1983 claims against the City, along with any official-capacity claims against the Individual City Defendants. (*Id.* at #300–01). Finally, the City contends that the Individual City Defendants who are sued in their individual capacities are entitled to qualified immunity because there were no underlying constitutional violations, or at least not clearly established ones. (*Id.* at #303–05). And even if there were, the City argues that the individuals would be protected by legislative immunity. (*Id.*).

Now turn to the Port. It argues that Plaintiffs failed to plead with particularity the constitutional violations that the Port and each Individual Port Defendant allegedly committed, thus precluding the § 1983 claims. (Doc. 86 at #690–92).

That leaves 3CDC. It argues that, because it and its employees are not state actors, nor do they engage in "state action," they cannot be liable under § 1983. (Doc. 84, #547, 558–59).

In contrast to their attacks on the § 1983 claims, which are varied, the Moving Defendants exhibit somewhat greater unanimity in their challenges to Plaintiffs' "tort" claims (Counts IV–VI).[13] The City and the Port, for example, both maintain that they (and their respective Individual Defendants) enjoy blanket immunity from suit from each of the three torts under Ohio Revised Code § 2744. (Doc. 83, #302–03; Doc. 86, #695). Meanwhile the Port and 3CDC argue that Plaintiffs failed to plead

---

[13] The Court puts "tort" in quotations because the general understanding of the phrase tort claims would be in reference to state common-law claims. Here, though, at least two of the tort claims are based on statutes, one state and one federal.

sufficient facts supporting any of the three tort claims under the *Iqbal*/*Twombly* standard. (Doc. 84, #549–57; Doc. 86, #692–94).

Plaintiffs responded to each motion. (Docs. 88, 89, 90). And the City, the Port, and 3CDC replied. (Docs. 92, 93, 94). So the motions are ripe for review.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Said differently, those well-pleaded facts must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 546–47. In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up). But while well-pleaded allegations are accepted as true, they are just that—allegations. All told, at the motion to dismiss stage, courts play "an important gatekeeper role," as they ensure that "claims rise beyond the level of speculation before submitting defendants to the potential rigors (and the costs) of the discovery process." *Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 853 (S.D. Ohio 2020).

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). Usually, that limits a court to considering the complaint and any attached documents. *Id.* But sometimes a court may properly consider other things. It may, for example, consider exhibits attached to a defendant's motion to dismiss if they are referenced in the complaint and central to the plaintiff's claims. *Bassett*, 528 F.3d at 430. And a court can consider public records or decisions of public agencies, although only as to their operative effect, and not as to the truth of their factual assertions. *See Hancock v. Miller*, 852 F. App'x 914, 919–20 (6th Cir. 2021); *J.P. Silverton Indus. L.P. v. Sohm*, 243 F. App'x 82, 86–87 (6th Cir. 2007).

## LAW AND ANALYSIS

Plaintiffs assert six claims against Defendants. Three (presumably) arise under § 1983 and allege federal constitutional violations; the other three arise under state and federal statutory and common law. For the reasons discussed below, none meet the plausibility threshold. But before turning to the sufficiency of Plaintiffs' claims, the Court starts by addressing three threshold issues that the City raises as to certain Plaintiffs—specifically, Sparks, Poole, Thompson, Hill, McCrary, and Allen.

**A.    Various Defenses Bar Some or All of Plaintiffs Sparks', Thompson's, Hill's, McCrary's, and Allen's Claims.**

As mentioned, the City first argues that (1) the statute of limitations bars Plaintiffs Sparks', Poole's, Thompson's, and Hill's § 1983 claims, (2) the *Rooker-Feldman* doctrine prevents the Court from hearing any of McCrary's claims, and

(3) *Younger* abstention precludes each of Allen's claims. (Doc. 83, #293–97). In support of its argument, the City attaches various exhibits to its motion to dismiss. Specifically, it attaches court documents and orders related to three separate legal proceedings that involve or involved certain Plaintiffs in this case (which it labels Exhibits A through L), of which the City asks the Court to take judicial notice. (Doc. 83, #283–86). The City also attaches records of demolition notices related to Thompson's properties (Exhibits M through P). (Doc. 86, #286–87).

Before discussing the impacts of those documents, though, the Court begins by noting that Plaintiffs object to the Court's consideration of them. First, Plaintiffs argue that, while the Court may take judicial notice of a document's existence, it cannot take judicial notice of the document's substance. (Doc. 88, #702). And second, Plaintiffs claim that, because they did not attach the court documents or demolition notices to their Complaint, the Court cannot consider them. (*Id.* at #701). The Court considers each set of exhibits in turn.

Start with the legal documents. Exhibits A through C are court documents from *Sparks v. Cranley*, No. 1:20-cv-713 (S.D. Ohio), which the City relies on as establishing the trigger date for Sparks', Hill's and Poole's (all of whom were plaintiffs there) limitations periods. (Docs. 83-1, 83-2, 83-3). The City argues, and Plaintiffs agree, that the Complaint incorporates these documents by reference. (Doc. 88, #701–02; City Reply, Doc. 92, #736–37). The Court can therefore properly consider these exhibits. *See Bassett*, 528 F.3d at 430.

13

Turn to Exhibits D through H. (Docs. 83-4, 83-5, 83-6, 83-7, 83-8). These are court documents related to *City v. McCrary Sr.*, No. A 2203230 (Hamilton Cnty. Ct. Com. Pl.), which, according to the City, demonstrate how the *Rooker-Feldman* doctrine prevents the Court from considering McCrary's claims here. (Doc. 83, #294–95). Likewise, the City contends that Exhibits I through L, (Docs. 83-9, 83-10, 83-11, 83-12), which are court documents related to *City v. Pure Development Group LLC*, No. A 2300312 (Hamilton Cnty. Ct. Com. Pl.), show why *Younger* requires the Court to abstain from considering Allen's claims. (Doc. 83, #296–97). Plaintiffs oppose the Court's consideration of these documents because the Complaint does not reference them and because the Court cannot take judicial notice of a public record's substance or content. (Doc. 88, #702). As the City highlights, however, "Plaintiffs misconstrue the precedents." (Doc. 92, #739). The Court "may take judicial notice of the contents of state court records to evaluate [a defendant's] Rule 12(b)(6) motion." *Boyer v. Clinton Cnty. Sheriff's Off.*, 645 F. Supp. 3d 815, 822 (S.D. Ohio 2022); *see also Wershe v. City of Detroit*, 112 F.4th 357, 373 (6th Cir. 2024). True, in doing so, the Court cannot consider the documents for the truth of the matters they assert. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). But the Court can consider them to discern their operative effect. *See id.* (affirming a district court's consideration of a bankruptcy court order to determine its preclusive effect); *Blake v. Wells Fargo Bank, NA*, 917 F. Supp. 2d 732, 738 n.2 (S.D. Ohio 2013) (taking judicial notice of state court records to determine whether various abstention doctrines applied). As such, the Court can consider Exhibits D through L to determine whether

the operative legal effect of these documents is to bar McCrary's and Allen's claims in this matter. *Stewart v. Brown*, No. 23-3690, 2024 WL 3551151, at *1 (6th Cir. Apr. 4, 2024) (affirming the district court's consideration of state-court proceedings to determine whether *Rooker-Feldman* or *Younger* applied).

Now consider the demolition notices—Exhibits M through P. (Docs. 83-13, 83-14, 83-15, 83-16). The City argues that the Court may consider these documents to determine whether the statute of limitations bars Thompson's claim. (Doc. 83, #286–87, 293–94). Plaintiffs maintain that the Court cannot consider these notices because the Complaint doesn't reference them. (Doc. 88, #701). But the Complaint does reference "notices of demolition … attached to [Thompson's] buildings," which it seemingly relies on in connection with alleging its due process claim. (Doc. 1, #35–38). That alone indicates that the Court can properly consider these notices. *Bassett*, 528 F.3d at 430; *see also Ball v. Tilton*, No. 21-3936, 2022 WL 1102027, at *3 (6th Cir. Apr. 13, 2022). Beyond that, though, the notices are public records the Court may consider to determine their operative effect—that is, whether they bar Thompson's claims here on statute of limitations grounds. *See Winget*, 537 F.3d at 576.

Having resolved that dispute, the Court turns to the City's statute of limitations, *Rooker-Feldman*, and *Younger* abstention arguments.

### 1. The Statute of Limitations Bars Plaintiffs Sparks', Hill's, and Thompson's § 1983 Claims, But Not Poole's.

The City argues that the statute of limitations bars Plaintiffs Sparks', Hill's, Thompson's, and Poole's § 1983 claims. (Doc. 83, #293–94). Although a Rule 12(b)(6) motion is usually not the right vehicle to dismiss a claim on statute-of-limitations

grounds, dismissal may be "warranted if the allegations in the complaint affirmatively show that the claim is time-barred." *Jodway v. Orlans, PC*, 759 F. App'x 374, 379 (6th Cir. 2018) (citation omitted). Notably, though, the defendant bears the burden of showing the statute of limitations bars a plaintiff's claim. *Id.*

In the § 1983 context, the limitations period "is the relevant state's statute of limitations for personal-injury torts." *Beaver St. Invs., LLC v. Summit Cnty.*, 65 F.4th 822, 826 (6th Cir. 2023). In Ohio, a two-year statute of limitations applies. *Id.*; *see also* Ohio Rev. Code § 2305.10. That said, while state law provides the relevant limitations period, federal law determines when it starts to run. *Beaver St. Invs.*, 65 F.4th at 826. And, under federal law, that limitations period begins to run "when a plaintiff has a complete and present cause of action"—that is, when a plaintiff "knows or has reason to know of the injury which is the basis of his action." *Id.* (cleaned up); *see also Hollis v. Erdos*, 480 F. Supp. 3d 823, 829 (S.D. Ohio 2020) (collecting cases). In cases where the alleged harm arises from an enforcement action, a plaintiff's § 1983 claim accrues, as a general rule, when the relevant enforcement action occurs, as that is typically when a plaintiff's cause of action is "complete." *See, e.g.*, *Beaver St. Invs.*, 65 F.4th at 826 (explaining that a takings claim accrues when the government takes a plaintiff's property); *Coudriet v. Vardaro*, 545 F. App'x 99, 102 (3d Cir. 2013) (explaining that the plaintiff's selective enforcement claim accrued when police arrested him).

Against that backdrop, the City points to a separate lawsuit Sparks, Hill, and Poole filed in 2020, which apparently raised claims identical to those alleged here.[14] (Doc. 83, #293). That lawsuit, the City says, shows that those Plaintiffs' present claims are "at least four years old," thus falling outside the statute of limitations. (*Id.*). And the City offers notices of demolition to show that Thompson's claims likewise are time-barred. (*Id.* at #294).

In assessing the impact of those earlier events, recall that Plaintiffs collectively assert injuries under three theories of § 1983 liability. Two are premised on Defendants selectively enforcing the City's building code, which Plaintiffs argue violates equal protection (Counts I and III). The other theory rests on alleged due process and takings violations (Count II). To analyze whether the claims are time-barred, then, the Court must consider when Sparks', Hill's, Thompson's, and Poole's injuries accrued under both the selective-enforcement theory and the takings theory of § 1983 liability. As the Court embarks on that task, keep in mind that Plaintiffs filed this lawsuit on April 19, 2024.

### a. Takings Claims

Start with the easier theory. As noted, the statute of limitations typically accrues when Plaintiffs knew of the conduct that constituted the taking—that is, when Defendants took enforcement action on Plaintiffs' properties. *Epcon*

---

[14] In its Reply, the City argues that a 2021 final judgment rendered in the *Sparks v. Cranley* lawsuit (that dismissed those claims without prejudice) precludes Plaintiffs Sparks, Poole, and Hill from asserting those same claims here. (Doc. 92, #739–40). But that argument is notably absent from its motion to dismiss. (*See generally* Doc. 83). So the Court will not consider it. *Phillips v. City of Cincinnati*, 479 F. Supp. 3d 611, 657 (S.D. Ohio 2020) ("[I]t is generally improper to consider an issue raised for the first time in a reply brief[.]").

*Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 887 (4th Cir. 2023); *see also Beaver St. Invs.*, 65 F.4th at 826 ("A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." (cleaned up)).

Sparks alleges that she was evicted from (or, to use the technically correct legal term, "ordered to vacate," (Doc. 92, #740 n.1)) her property on April 22, 2015. (Doc. 1, #33). Beyond that, she says the Department of Buildings and Inspections denied her request for property records on August 12, 2021, and that her "building remains vacant as of January 24, 2024." (*Id.* at #33–34). Sparks therefore knew of her injury—the order to vacate—in 2015 (the Court is unclear as to how a records request denial or the property's current vacant status amount to violations on which Sparks could rely to assert either a takings, due process, or selective-enforcement claim). So her takings claim is time-barred, as it occurred well over two years before Plaintiffs filed this suit.

Move to Hill. She alleges that her "property … was included in her bankruptcy estate and then purchased by her attorney who became the Hamilton County Treasurer." (*Id.* at #35). Though the Complaint does not specify when this transaction occurred, Plaintiffs' Response admits that Hill sued in 2018—six years before this suit—over the City's actions "concerning her real property." (Doc. 88, #706). The enforcement action therefore occurred, at the very least, six years ago. So Hill's takings claim falls well outside the two-year limitations period.

18

Next, consider Thompson. He alleges that the City demolished six buildings he owned, but fails to specify when. (*See* Doc. 1, #35). According to the notices of demolition, though, the City demolished the properties in 2013. (Doc. 83-13, #473; Doc. 83-14, #484; Doc. 83-15, #507; Doc. 83-16, #527). Thompson obviously knew of the demolitions in 2013, which means they accrued then and are time-barred now.

That leaves Poole. He alleges that he received notices of code violations—specifically, that he needed to repair and paint his siding—on December 12, 2023. (Doc. 1, #32). Poole further claims, without providing any dates, that he received "no notice" of the inspection that gave rise to the code violation, and that someone destroyed the side of his building at Defendant Dahlberg's direction without compensating him. (*Id.* at #32–33). These allegations seem to raise takings claims, but since Poole provides no dates, the Court cannot discern when they accrued. The City argues that the 2023 code-violation notice Poole received "was simply the effect of earlier City enforcement action," and therefore cannot bring his claims within the statute of limitations because the continuing violation doctrine doesn't apply here. (Doc. 92, #741). The Court agrees that the continuing violation doctrine doesn't necessarily apply (more on that later), but it cannot agree that the statute of limitations bars Poole's claims—at least not based on the face of the Complaint or any documents as to which the Court can take judicial notice. As alleged, Poole's takings claims accrued on the day Defendants took enforcement action against him—that is, the day the City destroyed the side of his building. True, Poole doesn't specify what day those incidents occurred. But the City likewise fails to meet its burden in

affirmatively showing that those claims fall outside the limitations period. So the Court cannot dismiss Poole's takings claims on limitations grounds.[15]

### b. Selective-Enforcement Claims

Turn to the selective-enforcement claims. In keeping with the general rule noted above, a selective-enforcement claim typically accrues "at the time that the wrongful act resulting in damages occurs." *Dique v. New Jersey State Police*, 603 F.3d 181, 188 (3d Cir. 2010); *see also Dural v. Sunia*, Civ. No. 21-00461, 2023 WL 7413740, at *7 (D. Haw. Nov. 9, 2023) (citing *Poe v. City of Rolling Hills Ests.*, 59 F.3d 175, 1995 WL 378655, at *2 (9th Cir. June 26, 1995) (Table)) ("A selective prosecution claim pursuant to Section 1983 begins to accrue as soon as the prosecution is initiated."). But "typically" is not "always." Some courts have recognized an exception to that general rule, permitting plaintiffs to extend the accrual date when they put forth facts suggesting that they were "reasonably unaware" of the selective-enforcement injury at the time the enforcement action occurred. *See Dique*, 603 F.3d at 188. In those instances, the selective-enforcement claim accrues when "the plaintiff becomes aware that he has been the victim of selective enforcement." *Lopez v.*

---

[15] Poole may also be raising a procedural due process claim based on not receiving a notice of inspection and based on his alleged incarceration; the Complaint is best described as opaque on that question. But, if he is, the Court arrives at the same result on the statute-of-limitations issue: the Court cannot discern when that claim accrued because the Complaint does not provide a date, nor did the Moving Defendants supply any documents of which the Court can take judicial notice that suggest when the inspection or incarceration occurred. So the Court cannot grant dismissal on that ground. That said, once the date of inspection or incarceration is established on the record, the parties may wish to re-assess whether seeking judgment as a matter of law on limitations grounds is appropriate then.

*DiDonato*, No. CV 16-2939, 2017 WL 1023344, at *5 (D.N.J. Mar. 16, 2017) (citing *Dique*, 603 F.3d at 188).

How does that play out here? Begin again with Sparks and Hill. Their selective-enforcement claims suffer from the same defects. Recall that Defendants allegedly took enforcement action against Sparks on April 22, 2015, (the order to vacate), and against Hill sometime before or during 2018 (the bankruptcy sale). Under the general rule, then, their claims accrued (at the latest) on those dates, meaning the two-year limitations period bars their claims. To escape that result, they would need to allege facts making it at least plausible that they could avail themselves of the "reasonably unaware" exception. But they can't. That is because, in a 2020 lawsuit, Sparks and Hill sued many of these same Defendants over these same enforcement actions alleging, among other things, discrimination. (*See* Compl., *Sparks v. Cranley*, No. 1:20-cv-713 (S.D. Ohio Sept. 11, 2020), Doc. 1). And Hill had filed two other similar lawsuits even before the 2020 suit. (*See* Compl., *Smith v. United States*, No. 1:08-cv-408 (S.D. Ohio July 2, 2008), Doc. 11; Compl, *Hill v. Goering*, No. 1:18-cv-522 (S.D. Ohio Aug. 20, 2018), Doc. 3). In short, instead of being "reasonably *un*aware" of the alleged selective enforcement, Sparks and Hill were aware enough to sue over it. That means the accrual exception cannot save their time-barred selective-enforcement claims.

Thompson's claims rooted in selective enforcement also fail. Recall that the City took enforcement action against his properties (by demolishing them) in 2013. Under the general rule, then, Thompson's selective-enforcement claims accrued in

2013. And the exception that saves "reasonably unaware" plaintiffs' claims does not save Thompson's. He pleaded no facts to suggest that in the *ten years* since the demolitions occurred that he did not somehow become reasonably aware of the racial animus that allegedly motivated the City's enforcement actions. Said differently, the Court sees no way to plausibly read Thompson's allegations as warranting application of the exception. His selective-enforcement claims are thus time-barred. That Thompson emailed his complaints about this "unethical process" to the City on June 13, 2022, does nothing to revive those stale claims. (Doc. 1, #36).

But as to Poole, the story changes. Much like with his takings claims, the Court cannot conclude that Poole's selective-enforcement claims fall outside the limitations period. Under the general accrual rule, Poole's claims would have accrued whenever Defendants took the above-outlined enforcement actions against him. But because the Court cannot discern when those actions occurred, it likewise cannot discern when his related selective-enforcement claims accrued. So, based on the current record, the Court cannot conclude that the statute of limitations bars Poole's selective-enforcement claims.

### c. The Continuing Violation Doctrine Does Not Apply.

Notwithstanding the above, Plaintiffs argue that they have a magic bullet against any statute-of-limitations defense, even if the underlying enforcement actions occurred years ago, and even if the Plaintiffs have previously raised the same racial animus allegations that animate their actions here in earlier lawsuits. Specifically, they point to the continuing violation doctrine—which allows a plaintiff essentially

to sidestep the statute of limitations in some situations—and argue that it applies to each of the four Plaintiff's claims. (Doc. 88, #704–07). The Court disagrees.

A continuing violation "exists if (1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009) (cleaned up). The Sixth Circuit has identified two narrow categories of continuing violations: those alleging a "prior discriminatory activity that continues into the present" and those alleging "a long-standing and demonstrable policy of discrimination against a class of which the plaintiff is a member." *Baar v. Jefferson Cnty. Bd. of Educ.*, 311 F. App'x 817, 823–24 (6th Cir. 2009) (cleaned up). Discrete constitutional violations, however, fall outside this doctrine unless the plaintiff alleges facts suggesting that the allegedly discriminatory acts "occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." *Id.* at 824; *see also Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 606 F.3d 301, 308 (6th Cir. 2010) ("A continuing violation in a § 1983 action occurs when there are continued unlawful acts, not by continued ill effects from the original violation.").

Plaintiffs' claims here fall on the non-continuing side of the line. The allegedly unlawful activity that each Plaintiff raises—the vacancy order (Sparks), bankruptcy sale (Hill), and demolitions (Thompson)—would all be discrete violations. And what allegedly occurred after the initial violations at most reflects ongoing ill effects resulting from those original violations. So while Plaintiffs argue that the City's

actions "have been continuous and have occurred in each case up until the time limits for a 1983 action," (Doc. 88, #706), they fail to provide factual allegations substantiating that argument.

In sum, the continuing violation doctrine does not save Sparks', Hill's, or Thompson's § 1983 claims, so those claims are untimely. But Poole's § 1983 claims, by contrast, are not subject to dismissal on limitations grounds on the current record.

### 2. *Rooker-Feldman* Bars McCrary's Claim.

Next, the Court addresses a jurisdictional hurdle, *Rooker-Feldman*, which the City contends bars all of McCrary's claims. That doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." *Dates v. HSBC*, 721 F. Supp. 3d 616, 625 (S.D. Ohio 2024) (citing *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007)). It covers not only claims that seek to directly challenge state-court judgments, but also any federal claims that are "inextricably intertwined" with such state-court judgments. *Voit v. Louisville & Jefferson Cnty. Bd. of Health*, 20 F. App'x 488, 489 (6th Cir. 2001).

Here, McCrary alleges that the City mailed code violations to an incorrect address, invoiced him for the cost of cleanup at his properties, and seized his personal property. (Doc. 1, #34). But two Hamilton County Court of Common Pleas orders already "squarely addressed" those concerns. (Doc. 83, #294–95). Specifically, the

state court declared McCrary's properties (the same ones at issue here)[16] public nuisances, permitted the City to invoice McCrary for the cost of abating the nuisances, and determined that the notice he received was adequate. (Doc. 83-5, #388–91). Then the state court denied McCrary's motion for reconsideration of that judgment. (Doc. 83-7, #422–23; Doc. 83-8, #425).

McCrary now raises procedural due process and takings claims premised on identical facts to those that the state court considered. Through those claims, he is plainly attempting to "undo" the state court's judgment, which means *Rooker-Feldman* bars those claims. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005).

But the Court's analysis does not end there. That's because the gravamen of McCrary's federal-court allegations is that the City selectively enforced its building code against him, and that Defendants conspired to dispossess him of his property in violation of his rights under the Equal Protection Clause. McCrary did not raise those

---

[16] McCrary alleges that he owns properties located at 3676, 3680, 3682, and 3684 Vine Street. (Doc. 1, #34). The state-court order, however, only addressed the 3676, 3682, and 3684 Vine Street Properties. (*See* Doc. 83-5, #389). That could perhaps pose a problem for the Court's *Rooker-Feldman* analysis. But after reviewing publicly available Hamilton County Auditor property records, "which are appropriate for the taking of judicial notice," *see MacIntosh v. Clous*, 69 F.4th 309, 313 (6th Cir. 2023), the Court concludes that it does not. Based on the Court's search, it appears that 3680 Vine Street either does not exist, or that, at the very least, McCrary does not own that property. *Online Property Access*, Hamilton Cnty. Auditor (last accessed Jan. 30, 2025), https://perma.cc/5DHS-PBUJ. While a search of the Auditor's records produced parcel identification numbers for 3676, 3682, and 3684 Vine Street and listed McCrary as the owner of those parcels, no record entries appeared for the 3680 Vine Street property, nor does a search on McCrary's name in that database return any property located at 3680 Vine Street. *Id.* So the Court is satisfied that the state-court order addressing the three properties on Vine Street that McCrary does own is sufficient to bar all of McCrary's claims on *Rooker-Feldman* grounds, notwithstanding the allegation in the Complaint regarding 3680 Vine Street.

issues in the state proceedings. So can he pursue them now as claims independent from the state-court judgment? Answering that question requires the Court to determine whether the state-court judgment is the "source" of the selective-enforcement injury McCrary asserts here. *In re Smith*, 349 F. App'x 12, 14 (6th Cir. 2009) (quoting *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir.2006)). If it is, then *Rooker-Feldman* prevents the Court from considering his claims. *Id.*

Making that question more difficult, it seems courts have followed two divergent paths when it comes to *Rooker-Feldman* and selective-enforcement claims arising after a state-court judgment. Some courts understand any later-raised selective-enforcement claim to arise "independently" of the previous state-court judgment. *See, e.g.*, *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 424–26 (3d Cir. 2003); *Banyai v. Town of Pawlet*, No. 23-1234-cv, 2024 WL 1878742, at *2 (2d Cir. Apr. 30, 2024). According to these courts, the "source" of the injury is not the state court's judgment, but rather the prosecutor's decision to file the claim in the first instance. Thus, the federal action is not attacking the former, but rather only the latter, and accordingly *Rooker-Feldman* is not implicated.

Other courts, however, understand the state-court judgment *itself* to cause the plaintiff's injury, meaning any later-raised selective-enforcement claim is necessarily inextricably intertwined with that earlier state-court judgment. *Williams v. City of Aurora*, No. 20-cv-2549, 2024 WL 1195515, at *17 (N.D. Ill. Mar. 20, 2024). That is, while the discriminatory conduct at issue may be that of the prosecutor in deciding to bring the enforcement action, it is the state court's judgment that actually inflicts

the (allegedly unconstitutional) harm on the plaintiff. So remedying that harm would require the federal court to invalidate the state-court judgment, creating the forbidden entanglement between the federal and state judicial systems.

While it is perhaps a close call, the Court finds the latter a more accurate description of *Rooker-Feldman*'s contours. To be sure, a selective-enforcement plaintiff like McCrary "may have [] an abstract right not to be selected for prosecution in a discriminatory manner." *Id.* (cleaned up). But abstractions aside, McCrary suffered no *legally cognizable injury* "until the state court acted" by declaring his properties a nuisance and by permitting the City to invoice him for cleanup costs. *Id.* (citation omitted); *cf. RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 388–89 (6th Cir. 2021) (explaining that the government's conduct was not "independent of the state court's [o]rder" since the government "took [the plaintiff's] property as a consequence" of that order). In other words, McCrary's injuries flowed directly from the state court's judgment and the costs he had to pay as a result. As McCrary now requests compensatory damages (among other forms of relief), a favorable judgment in this Court necessarily would "render the [state-court] judgment ineffectual." *Shooting Point, L.L.C. v. Cumming*, 368 F.3d 379, 383–85 (4th Cir. 2004). That is what *Rooker-Feldman* prohibits. Further underscoring the appropriateness of that result, nothing prevented McCrary from raising his selective-enforcement claim in state court in a bid to undo the state-court judgment. *See, e.g.*, *City of Columbus v. Reiner*, 108 N.E.3d 719, 726–28 (Ohio Ct. App. 2018) (considering selective-enforcement arguments on appeal notwithstanding that the trial court's order had

27

not addressed that issue). It appears he simply elected not to avail himself of that opportunity. In any event, McCrary's present disagreement ultimately is with the manner in which the state court adjudicated the City's public nuisance claims, and that does not suffice to clear the *Rooker-Feldman* hurdle. *Voit*, 20 F. App'x at 489–90 (finding that *Rooker-Feldman* barred a selective-enforcement claim where the federal-court complaint "assert[ed] claims against the persons and entities involved" in the state-court proceeding and raised grievances regarding the state court's decision).

In short, although McCrary does not formally frame this suit as an attempt to appeal the state-court judgment, in substance that is what he seeks to accomplish. His theory is that the City (and the other Defendants) violated his constitutional rights when they engaged in the very activities the state court approved. That doesn't work to keep his claim in federal court. *See Shooting Point*, 368 F.3d at 384 ("Because the [state] courts implicitly held that [the plaintiff] was properly subject to the [relevant] regulations, a federal district court finding of selective enforcement … would clearly contravene the state courts' judgment"). If McCrary wanted to challenge the state-court judgment, an appropriate mechanism for that would have been an appeal in the state-court system, perhaps a motion under the Ohio equivalent of Federal Rule of Civil Procedure 60(b), or some other such vehicle. But a new action in federal district court that, if successful, necessarily would invalidate that state-court judgment is not among them. The Court lacks power to hear McCrary's § 1983 claims.

### 3. The Court Abstains from Hearing Allen's Claims Under *Younger v. Harris*.

That leaves the question of *Younger* abstention and what impact, if any, it has on Allen's claims. The *Younger* doctrine "prevents federal courts from staying or enjoining pending state court proceedings except under special circumstances." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 605 (6th Cir. 2007) (citing *Younger v. Harris*, 401 U.S. 37, 41 (1971)) (cleaned up). One such circumstance arises where a civil proceeding involves "certain orders that are uniquely in furtherance of the state court's ability to perform its judicial function." *Stewart v. Brown*, No. 23-3690, 2024 WL 3551151, at *2 (6th Cir. Apr. 4, 2024); *see also Aaron v. O'Connor*, 914 F.3d 1010, 1015–16 (6th Cir. 2019).

Allen's claims in this case fall within *Younger*'s ambit. The City filed a complaint in the Hamilton County Court of Common Pleas to abate public nuisances at Allen's three properties (the same ones at issue here) under Ohio Revised Code § 3767.41. (Doc. 83-9). Given that *Huffman v. Pursue, Ltd,* which extended *Younger* to civil proceedings, involved the very same chapter of Ohio's code (Ohio Rev. Code § 3767) and largely analogous facts, the Court is satisfied that *Younger* is in play. 420 U.S. 592, 595, 607 (1975). So the question becomes "whether (1) state proceedings are currently pending, (2) the proceedings involve an important state interest, and (3) the state proceedings provide [Allen] an adequate opportunity to raise her constitutional claims." *Stewart*, 2024 WL 3551151, at *2.

The City filed its state-court complaint against Allen on April 4, 2023, and the case remains open and active. *See City v. Pure Dev. Grp. LLC*, No. A 2300312

29

(Hamilton Cnty. Ct. Com. Pl.). That answers the first question. *Loch v. Watkins*, 337 F.3d 574, 578 (6th Cir. 2003). Turning to the second question, enforcing health, safety, and building code standards is undeniably an important state interest. *Huffman*, 420 U.S. at 604 ("[A]n offense to the State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding."). And as for the third question, Allen "made no effort to meet her burden of showing that she lacked an adequate opportunity to raise her constitutional claims in state court." *Stewart*, 2024 WL 3551151, at *2. So the Court will abstain from hearing Allen's claims here.

**B.** **The Remaining Plaintiffs Fail to Plausibly Allege § 1983 Claims.**

Turn now to the substance of the remaining Plaintiffs' (Akil and Omar Childress, Long, Berkhalter, and Poole) § 1983 claims. The City, the Port, and 3CDC each attack Plaintiffs' constitutionally-grounded claims from a slightly different angle. To keep things straight, and given the number of Moving Defendants, the Court will consider each of the three buckets of their arguments in turn.

**1.** **Because 3CDC Is Not a State Actor and Does Not Act Under Color of State Law, It Cannot Be Liable Under § 1983.**

Start with the easy one. Plaintiffs lump 3CDC into the relief they seek in each of their § 1983 claims. But liability under § 1983 usually exists only if the defendant is a state or local government agent. *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 757 (6th Cir. 2023). To state a § 1983 claim against a private actor, the plaintiff must allege that the defendant is acting under color of state law—essentially that the private actor is wielding what amounts to governmental authority. *Id.* Here, that requires Plaintiffs to allege facts suggesting that 3CDC's

actions "so approximate state action that they may be fairly attributed to the state." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). They fail to do so. And to the extent Plaintiffs rely on 3CDC's alleged receipt of federal funding to transform it into a state actor, that argument loses. *Id.* at 830; *Faparusi v. Case W. Rsrv. Univ.*, 711 F. App'x 269, 276 (6th Cir. 2017). As a matter of law, then, Plaintiffs failed to plausibly allege a § 1983 claim against 3CDC or its employees.

### 2. Plaintiffs Fail to Allege Their § 1983 Claims Against the Port and HCLRC with Sufficient Particularity.[17]

The Court next turns to the Port and HCLRC. Plaintiffs assert their three § 1983 claims against the Port, HCLRC, and their executives, employees, and board members, in both their official and individual capacities. But Plaintiffs' claims fail on all fronts.

To state a § 1983 claim, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). In doing so, a plaintiff "must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (emphasis in original); *see also Terrance v. Northville Reg'l Psychiatric Hosp.*,

---

[17] Because the Court concludes that Plaintiffs failed to adequately allege § 1983 claims against the Port and HCLRC, it does not analyze whether Plaintiffs seek to impose liability on the Port's employees or HCLRC's board members merely by virtue of their status in contravention of Ohio Revised Code § 1702.55(A) or Ohio common law. (Doc. 86, #689–90). Nor does it address this question of corporate status with regard to Plaintiffs' tort claims since the Court likewise finds that Plaintiffs failed to adequately plead those causes of action.

286 F.3d 834, 842 (6th Cir. 2002). To be clear, that does not mean a plaintiff must identify the unconstitutional conduct to any heightened standard beyond what *Iqbal/Twombly* requires.[18] *See Moore v. Whitmer*, No. 21-1755, 2022 WL 18862075, at *2 (6th Cir. Aug. 12, 2022) (applying the *Iqbal* standard and explaining that a plaintiff simply must "state 'a plausible constitutional violation by each individual defendant.'" (quotation omitted)). But for a plaintiff who alleges unconstitutional conduct by multiple defendants to pass the *Iqbal/Twombly* hurdle, the plaintiff must identify "with particularity" what *each* defendant allegedly did in connection with that unconstitutional conduct. *See id.* That is, a plaintiff cannot rely on "conclusory, vague or general allegations" as to each defendant's role to meet his or her pleading burden. *Terrance*, 286 F.3d at 842.

When it comes to the Port and HCLRC, Plaintiffs fall well short of that particularity requirement. Start with the Port executives and employees and HCLRC board members. Other than naming them in the Complaint's caption and listing them in the "Parties" section, Plaintiffs make no reference to (much less any allegation about) any actions that Individual Port or HCLRC Defendants allegedly took. "Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983." *Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004). True, the Complaint does allege that the "Port Officers" "violated [Plaintiffs'] civil rights" and "agreed overtly

---

[18] In other words, this "particularity" requirement, as it applies to § 1983 claims, does not impose the heightened pleading standard Federal Rule of Civil Procedure 9 requires for fraud claims.

and by acquiescence" to deprive Plaintiffs' civil rights. (Doc. 1, #37, 39). But those conclusory allegations don't get Plaintiffs over the *Iqbal/Twombly* hurdle. So Plaintiffs' individual-capacity claims against the Port executives and employees and HCLRC board members fail.

Next consider HCLRC. Other than listing HCLRC in the Complaint's caption and the demands for relief, Plaintiffs make only two allegations about the entity. First, they allege that two previous lawsuits put HCLRC "on notice of the predatory practices in the foreclosure and sale of African-American properties." (Doc. 1, #27–28). And second, Plaintiffs say that HCLRC, the City, and the Port met in scheduled public meetings or in private sessions, where they "agreed to pursue [] discriminatory and predatory practices," and "took the overt actions" described in the Complaint. (*Id.* at #40). But those allegations don't pass muster because neither explain how HCLRC allegedly deprived Plaintiffs of their constitutional rights. Even if it were reasonable to infer that discriminatory or predatory practices did occur, Plaintiffs utterly fail to describe what HCLRC did to advance those practices. True, they say that HCLRC took "overt action[]." (*Id.*). But none of Plaintiffs' 178 paragraphs detail what that overt action was. So the Court concludes that Plaintiffs' claims against HCLRC fail.

That leaves the Port. In fairness to Plaintiffs, their allegations against the Port are slightly more robust. They allege, for example, that the Port "utilize[s] a tactic of City expedited tax foreclosures to acquire properties owned by African-American residents," acts as a "strawman owner" of properties that it transfers to 3CDC to avoid county taxes, and uses the City's selective-enforcement tactics to "seize

properties with rising property values and to appoint receivers to sell the seized properties to developers." (Doc. 1, #24, 28–29). But again, none of that explains how the Port deprived *these Plaintiffs* of equal protection, due process, or just compensation under the Fifth or Fourteenth Amendments. And notably absent from the Complaint's "Individual Plaintiff" section is any indication that *the Port* seized any of Plaintiffs' properties. As such, Plaintiffs have not alleged a viable § 1983 claim against the Port.

Finally, a word on the official-capacity claims against the Port executives and employees and HCLRC board members. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Because the Court concludes that Plaintiffs' § 1983 claims against the Port and HCLRC fail, so too must their official-capacity claims against the Port's executives and employees and HCLRC's board members.

### 3. Plaintiffs Fail to Sufficiently Plead Their § 1983 Claims Against the City.[19]

That leaves Plaintiffs' three claims arising under § 1983 as against the City and the City's executives, employees, and councilmembers. Recall that, for various reasons, Plaintiffs Sparks, Hill, Thompson, McCrary, and Allens' claims are barred. The City argues that the remaining Plaintiffs—Akil and Omar Childress, Long,

---

[19] Since the Court finds that Plaintiffs failed to adequately state their § 1983 claims against the City, it does not reach the City's argument that Plaintiffs failed to plead *Monell* liability. (Doc. 83, #300–01).

Berkhalter, and Poole—fail to state a claim for relief under § 1983. (Doc. 83, #297–300). The Court agrees.[20]

Section 1983 provides a vehicle for vindicating federal rights conferred by the United States Constitution or other federal laws. *Johnson v. Ward*, 43 F. App'x 779, 781 (6th Cir. 2002). To plausibly allege a § 1983 claim based on a constitutional violation, Plaintiffs must "identify the specific constitutional right allegedly infringed." *Id.* at 781–82. Here, they point to three constitutional provisions that Defendants allegedly violated through the land redevelopment scheme: the Fourteenth Amendment's Equal Protection Clause (Counts I and III), along with the Fourteenth Amendment's Due Process Clause and the Fifth Amendment's Takings Clause (Count II).[21] But for the reasons discussed below, none work.

### a. Equal Protection

Start with Plaintiffs' equal protection claim, which the Court understands to be a selective-enforcement claim.[22] To raise an equal protection claim based on

---

[20] As noted, the City argues that its executives, employees, and councilmembers are entitled to qualified immunity on the individual-capacity claims. (Doc. 83, #303–05). It also argues that the Mayor, the City Manager, and its Councilmembers are entitled to absolute legislative immunity for their approval of redevelopment projects. (*Id.* at #304). Because the Court concludes that Plaintiffs failed to plausibly allege their § 1983 claims, however, the Court need not reach the qualified immunity question, nor the legislative immunity question.

[21] Plaintiffs Long and Poole also allege that two inspectors trespassed on their properties. (Doc. 1, #31–32). But they fail to allege that Defendants violated their right to be free from unreasonable searches under the Fourth Amendment. Even if they had, those trespass allegations come with no details or dates that would support a reasonable inference that the inspectors violated Plaintiffs' Fourth Amendment rights when they entered their properties.

[22] Plaintiffs claim that the City's Building and Inspection Department "selectively appl[ied] fines" to and "targeted citations" at African American-owned properties. (Doc. 1, #28–29, 37). They also allege that the City "systematically prosecuted" African American building owners. (*Id.* at #29). This language suggests a selective-enforcement claim.

selective enforcement, Plaintiffs must plausibly allege: (1) that they belong to an identifiable group, and that the state actor singled them out, despite deciding not to prosecute persons outside that group in similar situations; (2) that the state actor initiated the prosecution with a discriminatory purpose; and (3) that the prosecution had a discriminatory effect on the group to which they belong. *Rieves v. Town of Smyrna,* 959 F.3d 678, 700 (6th Cir. 2020).

Plaintiffs' Complaint stumbles on the first step. Sure, it alleges that Defendants selectively enforced the City's building code against African American-owned properties so Defendants could declare those properties vacant or public nuisances. (Doc. 1, #25, 27, 37). But the Complaint fails to plausibly establish that the City did not likewise cite similarly situated, non-African American property owners in the OTR and Mt. Auburn neighborhoods for code violations. Only two paragraphs even come close to alleging that any Defendant treated non-African American property owners more favorably. The first alleges that Sparks' former property has remained vacant since her eviction and the City has not fined or coerced the new white owners about the vacancy. (Doc. 1, #33). That allegation, however, relates only to Sparks whose claim, recall, the statute of limitations bars. And, in any event, a single example of an African American property owner allegedly receiving worse treatment than a later white owner of the same property seems a pretty thin reed on which to hang a discrimination claim. The second (and only other) allegation of selective enforcement states that the City and the Port "targeted citations of African-American property owners while giving favorable treatment to Caucasian

and corporate building owners." (*Id.* at #37). That is a conclusory statement that lacks factual support—Plaintiffs cannot rely on it to establish the sufficiency of their claims. All told, Plaintiffs failed to allege a viable claim for selective enforcement under the Fourteenth Amendment's Equal Protection Clause.

### b. Procedural Due Process and Takings

Move to the due process and takings claims. Plaintiffs' allegations range from inadequate notice of the City's actions concerning their properties, to property demolitions, to takings of personal property, to incarcerations. (*Id.* at #29–39). The Court therefore understands Count II to press both a procedural due process claim under the Fourteenth Amendment and a Takings Clause claim under the Fifth Amendment. The Court addresses each in turn.

Start with the Due Process Clause. The Fourteenth Amendment says that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a procedural due process claim, a plaintiff must allege facts that "(1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

Plaintiffs maintain that Defendants deprived them of their real and personal property, as well as Poole's and Omar Childress's liberty (through incarceration), without proper notice. (Doc. 1, #29–36). No one disputes that those are valid due process interests. And to Plaintiffs' credit, they are correct that due process "requires

notice and an opportunity to be heard before the government acts against a person or his property." *Gammarino v. Sycamore Twp.*, No. 1:22-cv-200, 2024 WL 760097, at *5 (S.D. Ohio Jan. 22, 2024) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). But a different problem looms. Plaintiffs failed to plead any facts suggesting that the state remedies for redressing their wrongs are inadequate.[23] Nothing in their Response suggested as much either. (*See generally* Doc. 88). So dismissal is warranted for failure to sufficiently plead a procedural due process claim. *Freeman v. Spoljaric*, 667 F. Supp. 3d 636, 650 (S.D. Ohio 2023) (citing *Gibbs v. Hopkins*, 10 F.3d 373, 377–78 (6th Cir. 1993)).

Now turn to the takings claims. The Fifth Amendment's Takings Clause, which applies to state governments through the Fourteenth Amendment, prohibits taking "private property … for public use, without just compensation." U.S. Const. amend. V; *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 609 (6th Cir. 2016). Plaintiffs Akil and Omar Childress, Long, and Poole each allege some sort of

---

[23] Whether a plaintiff must plead facts showing that there is no adequate state remedy for the alleged deprivation implicates the *Parratt* doctrine. *Hill v. City of Jackson*, 751 F. App'x 772, 777 (6th Cir. 2018). That doctrine "divides procedural due process claims between those that involve a direct challenge to an established state procedure and those challenging random and unauthorized acts." *Id.* (cleaned up). Only claims falling in the latter category must plead inadequate state remedies to sufficiently state a procedural due process claim. *Id.* Here, the Court concludes Plaintiffs' claims fall within that latter category. The City highlighted that Cincinnati Municipal Code requires notice by mail and posting at the address for both code violations and demolitions. (Doc. 83, #299 n.1 (citing Cincinnati Mun. Code §§ 1101-57, 1101-61)). Those "established state procedures," however, are not what Plaintiffs challenge. Rather, they argue that the City failed to issue those required notices prior to depriving them of their property. So the actions they challenge are "more akin to a 'random and unauthorized' act," thus falling within *Parratt*'s ambit. *Hill*, 751 F. App'x at 778–79. Because their Complaint did not "explain why the ability to be heard in state court" could not remedy the alleged violations, they failed to state a claim for procedural due process. *See id.* at 779 (cleaned up).

demolition or destruction of their properties. (Doc. 1, #29–32, 35). But they each also admit that the demolition or destruction related to a cited code violation. (*Id.*). That vitiates their takings claims "because demolition, compliant with local law and procedure, in order to enforce building codes or abate a public nuisance does not constitute a taking as contemplated by the federal Constitution." *Davet v. City of Cleveland*, 456 F.3d 549, 553 (6th Cir. 2006) (cleaned up); *see also Embassy Realty Invs., Inc. v. City of Cleveland*, 572 F. App'x 339, 344–45 (6th Cir. 2014). So they fail to plausibly allege a Takings Clause claim.[24]

### c.    Conspiracy to Violate Civil Rights

Finally, consider the claim for conspiracy to violate civil rights. Such a claim exists under § 1983 when there is "an agreement between two or more persons to injure another by unlawful action." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citation omitted). To survive a motion to dismiss, a plaintiff must adequately plead "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Id.* (cleaned up). Plaintiffs fail to do so.

Other than obliquely claiming that the City, the Port, HCLRC, and 3CDC each employed a "tactic" or "scheme" to collectively redevelop the OTR and Mt. Auburn neighborhoods in a discriminatory manner, Plaintiffs do not allege that a single plan

---

[24] True, if the taking is accomplished through discriminatory conduct or for discriminatory purposes, the taking may be unlawful. But that is due to the Equal Protection Clause, not the Takings Clause. And here, as already described, Plaintiffs have failed to plead a viable equal protection claim.

existed, much less offer any facts supporting the existence of such a plan. (*See* Doc. 1, #23–29). True, Plaintiffs contend that the City, through its Plan, re-zoning ordinances, and targeted building code enforcement, violated their constitutional rights, (*id.* at #24–25, 27); that the Port relies on "City expedited tax foreclosures to acquire properties owned by African-American residents," (*id.* at #28); and that "3CDC utilizes Defendant Port as a strawman owner" to remove properties from the county real estate tax roll, (*id.* at #24). But those activities are seemingly discrete tactics that each separate entity employs in pursuit of its own individual objectives. In other words, they don't suggest a single plan. What is more, Plaintiffs concede that there is only one allegation expressly asserting an agreement among the three entities. (Doc. 89, #722). But that allegation—which says that "Defendants maliciously combined and agreed as enunciated [earlier in the Complaint]"—is once again conclusory, and in any event, the factual portions to which the allegation refers exclusively detail the City's actions, not the Port's or 3CDC's. (Doc. 1, #40).

Plaintiffs come a little closer to meeting their burden in terms of pleading facts showing a conspiratorial objective. They state that Defendants "intentionally and recklessly [] promote[d] and publish[ed] discriminatory regulations resulting in aggressive and predatory actions by their agents in the Buildings and Inspections Department in proactively targeting African-American building owners." (*Id.*). But, yet again, that only suggests *the City* had an objective to violate their civil rights, not that the Port or 3CDC did. After all, it is the City that "publishes regulations" and whose agents man "the Buildings and Inspections Department." Beyond that,

highlighting that a prior lawsuit put all Defendants "on notice" of the apparently discriminatory practices employed does nothing to show that the Port or 3CDC sought to deprive Plaintiffs of their rights. (*Id.* at #27–28; Doc. 89, #722).

Finally, Plaintiffs fail to allege an "overt act" by the Port or 3CDC that furthered the alleged conspiracy. Yes, Plaintiffs allege that the City enforced its building code against them in a discriminatory manner (though, again, they fail to show that property owners falling outside the protected class were treated more favorably). (Doc. 1, #29–36). But no Plaintiff even hints that the Port acquired any of their properties or that 3CDC acted as a receiver. They therefore fail to show how Defendants (including the Moving Defendants) took overt action as to them in furtherance of the conspiracy.

## C.    Plaintiffs' "Tort" Claims Fail.

Having concluded that Plaintiffs failed to allege any viable § 1983 claims, the Court next turns to what the Moving Defendants call the Complaint's three tort claims: civil conspiracy (under Ohio law), extortion (under Ohio law), and civil RICO (under federal law). Like before, the Moving Defendants make slightly different arguments for dismissal. The City and the Port (along with HCLRC) claim statutory immunity. 3CDC, meanwhile, argues that Plaintiffs failed to plausibly allege their tort claims, as does the Port. The Court starts with the former—immunity.

### 1.    The City, the Port, and HCLRC Are Immune from Counts IV and V.

As for the tort claims, the City, the Port, and HCLRC argue that they and their respective executives, employees, councilmembers, and board members (who

41

Plaintiffs sued in their official and individual capacities) are entitled to statutory immunity, and thus, the tort claims should be dismissed. (Doc. 83, #302–03; Doc. 86, #695). The Court agrees in part.

Ohio's Political Subdivision Tort Liability Act (PSTLA) "sets forth a comprehensive statutory scheme for the tort liability of political subdivisions and their employees." *Bogan v. Keith*, 2023-Ohio-4159, ¶ 10 (2d Dist.) (citing Ohio Rev. Code Chapter 2744). Different sets of rules apply when a political subdivision asserts immunity versus when its employees do. *Id.* ¶¶ 10–11 (comparing Ohio Rev. Code § 2744.02(B) (municipal immunity) with § 2744.03(A)(6) (employee immunity)). Both sets of analyses are relevant here.

Before getting too far into the immunity inquiry, though, the Court notes an initial wrinkle: Ohio Revised Code Chapter 2744 does not immunize municipalities or their employees against "[c]ivil claims based upon alleged violations of the … statutes of the United States." Ohio Rev. Code § 2744.09(E); *Two Bridges, LLC v. City of Youngstown*, No. 22-3506, 2023 WL 4030071, at *3 (6th Cir. June 15, 2023). Relevant here, Plaintiffs assert a civil RICO claim, which arises under 18 U.S.C. § 1961 et seq.—a federal statute. The City, the Port, HCLRC, and their employees, therefore, are not immune from Plaintiffs' civil RICO claim.

With that background in mind, start with political subdivision immunity. Remember that the City is a municipal corporation, the Port is a public agency, and HCLRC is a public non-profit corporation. Consequently, all three qualify for political subdivision immunity under Ohio Revised Code § 2744.02. *Two Bridges*, 2023 WL

4030071, at *3; Ohio Rev. Code § 2744.01(F). And despite naming those entities' employees and board members as Defendants in their official capacities, the official-capacity claims are effectively against the City, the Port, and HCLRC themselves. *Gammarino*, 2023 WL 1801058, at *5 (citing *Lambert v. Clancy*, 927 N.E.2d 585, 586 (Ohio 2010)).

Ohio courts apply a three-step analysis to determine whether a political subdivision is immune from liability. *Bogan*, 2023-Ohio-4159, ¶ 10. First, the court determines "whether the general grant of immunity provided by R.C. 2744.02(A) applies." *Wallace v. City of Rossford*, 2018-Ohio-2598, ¶ 27 (6th Dist.). If it does, at step two, the court considers whether the exceptions in R.C. § 2744.02(B) abrogate immunity. *Id.* Only if an exception applies does the court proceed to step three to assess whether "one of the defenses listed in R.C. 2744.03" applies and reinstates immunity. *Id.*

Beginning at step one, political subdivisions have immunity when acting "in connection with a governmental or proprietary function." Ohio Rev. Code § 2774.02(A). Here, the Complaint alleges that the City passed a zoning resolution and exercised its police power to abate public nuisances. (Doc. 1 #24–29; Doc. 92, #746–47). The Port and HCLRC, on the other hand, are alleged to have sought to acquire rundown properties and facilitate renewal projects pursuant to § 2744.01(C)(1)(q). (Doc. 1, #23–24, 28–29; Doc. 86, #695). All those actions amount to governmental functions.

Moving to step two, none of § 2744.02(B)'s five exceptions apply to abrogate immunity. Indeed, Plaintiffs, for their part, make no argument about § 2744.02(B).[25] The Court therefore concludes that the City, the Port, and HCLRC are statutorily immune from Count IV (civil conspiracy) and Count V (extortion). So too are their executives, employees, councilmembers, and board members to the extent they were sued in their official capacities.

The Court now turns to the separate immunity analysis for employees of political subdivisions under Ohio Revised Code § 2744.03. Here, courts do not employ a three-step inquiry. Rather, an employee enjoys immunity unless: "(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6); *Bogan*, 2023-Ohio-4159, ¶ 11.

Plaintiffs seek to invoke the second exception. The Complaint alleges that Defendants "maliciously combined and agreed … to deprive the Plaintiffs of their real and personal property … and proceeded intentionally and recklessly to promote and

---

[25] Rather than arguing that Ohio Revised Code § 2744.02(B) abrogates the City, the Port, and HCLRCs' immunity, Plaintiffs contend that *Ex Parte Young* permits them to sue these entities and their employees. (Doc. 88, #710; Doc. 89, #722–23). As the Port describes, though, *Ex Parte Young* isn't applicable here. (Doc. 94, #772). That doctrine "allow[s] federal courts to enjoin state officers in their official capacity from prospectively violating a federal statute or the Constitution." *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 904 (6th Cir. 2014). Plaintiffs' principal problem is that, in Counts IV and V, they seek to sue the Individual Defendants for violations of state, not federal, law. Beyond that, Plaintiffs seek money damages as relief. (Doc. 1, #40–41). But only injunctive relief is available under *Ex Parte Young*.

publish discriminatory regulations" that targeted African American-owned properties. (Doc. 1, #40). But Plaintiffs run into two problems. First, that is their only allegation of malicious or reckless conduct on Defendants' part. And their Responses point to no other factual allegations in the Complaint suggesting malice or animus. (*See* Docs. 88, 89, 90). Second, and relatedly, that sole allegation is nothing more than a bare legal conclusion. Passing a zoning resolution is not by itself malicious. Nor is enforcing a building code. That's especially so when the ordinance or enforcement action facilitates matters expressly permitted by Ohio law. *See* Ohio Rev. Code § 2744.01(C)(2)(q) (describing "[u]rban renewal projects and the elimination of slum conditions" as a "governmental function"). In sum, the Court concludes that the City, the Port, and HCLRC's executives, employees, councilmembers, and board members are immune from Plaintiffs' claims arising under Ohio law.

### 2. Plaintiffs Fail to State a Claim for Civil Conspiracy, Extortion, or Civil RICO.

Given that 3CDC is a private entity, it does not claim immunity. Rather, it argues that Plaintiffs failed to adequately allege their tort claims for civil conspiracy and civil RICO.[26] (Doc. 84, #549–57). The Port, for its part, argues that Plaintiffs likewise failed to adequately allege an extortion claim. (Doc. 86, #694). The Court analyzes each claim in turn.

---

[26] 3CDC presumably did not address the inadequacy of Plaintiffs' allegations on the extortion claim because, in its view, "[t]he only two causes of action where Plaintiffs even attempt to implicate 3CDC are the Fourth (Civil Conspiracy) and [Sixth] (Civil RICO)." (Doc. 84, #546). But even the extortion claim seeks damages from 3CDC. (Doc. 1, #41). At day's end, though, it doesn't matter because Plaintiffs failed to plausibly allege any of their tort claims against any Defendant.

45

### a. Civil Conspiracy

In Ohio, a civil conspiracy is the "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) (citation omitted). For the reasons already explored, Plaintiffs did not allege facts showing that the City, the Port, or 3CDC conspired to injure them. Other than conclusory allegations, the Complaint does not put forth any facts suggesting any agreement among the Moving Defendants. And even if the Complaint did include such allegations, there is no suggestion anywhere in the Complaint that the Moving Defendants carried out that plan against *these* Plaintiffs or the properties they own. (Doc. 84, #549). For example, no Plaintiff in any way connects the Port's or 3CDC's alleged conduct to their properties. So this claim fails.

### b. Extortion

Under Ohio Revised Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act … may recover full damages in [] a civil action." Plaintiffs assert that Defendants violated Ohio's criminal extortion statute—Revised Code § 2905.11. (Doc. 1, #41). But, problematically, the Complaint points only to the City's actions as constituting alleged extortion. (*Id.* ("The [] City has used the threat of legal action and the filing of legal actions[.]")). So the Complaint necessarily fails to state a claim for extortion against the Port, 3CDC, or their respective employees. And that the Port and 3CDC were put "on notice" of the City's apparent extortion does not help Plaintiffs' meet their burden to allege how the Port and 3CDC *themselves* engaged in

extortion. (Doc. 90, #730). As for the City (which doesn't challenge the sufficiency of Plaintiffs' tort allegations, but rather argues that it has immunity), the Court already deemed it immune from Plaintiffs' civil conspiracy and extortion claims. But even if that were not so, "a threat to pursue a civil action, even if the action would be entirely frivolous or brought in bad faith, does not constitute extortion." *Tilberry v. McIntyre*, 733 N.E.2d 636, 644 (Ohio Ct. App. 1999); *see also McGee v. E. Ohio Gas Co.*, 111 F. Supp. 2d 979, 988 (S.D. Ohio 2000). Plaintiffs thus failed to plausibly allege extortion.

### c. Civil RICO

Plaintiffs' final cause of action invokes the civil RICO statute, 18 U.S.C. § 1961, et seq. That statute outlines four types of prohibited activities, each of which entails different elements. *See* 18 U.S.C. § 1962(a)–(d); *see also Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 602–611 (E.D. Mich. 2015) (explaining the different pleading standards for claims brough under § 1962(a), (c), and (d)). Here, though, Plaintiffs' Complaint fails to identify under which subsection(s) they bring their civil RICO claim. Regardless, the existence of an "enterprise" and a "pattern of racketeering activity" are both necessary elements under each of the four prohibited activities. 18 U.S.C. § 1962(a)–(d); *see also Arnold v. Alphatec Spine, Inc.*, No. 1:13-cv-714, 2014 WL 2896838, at *9 (S.D. Ohio June 26, 2014). So the Court will consider whether Plaintiffs plausibly alleged those two baseline elements. Ultimately, they did not.

Start with the enterprise element. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.

§ 1961(4). Plaintiffs' Complaint doesn't expressly allege any enterprise—indeed, it neglects to use the word "enterprise" at all. Plaintiffs' Response, however, intimates that, when the Complaint referred to "[the] City, [the] Port, 3CDC, [HCLRC] and their named agents," (Doc. 1, #42), it meant to allege an association-in-fact enterprise. (Doc. 90, #731). Fair enough. "[A]n association-in-fact enterprise is 'a group of persons associated together for the common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Such an enterprise must have three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* And though it "need not have a hierarchical structure or a 'chain of command[,]' … the group must function as a continuing unit." *Id.* at 948.

Plaintiffs have failed to allege the existence of an association-in-fact enterprise. Their allegations, in large part, focus on the City's 2017 Plan, the 2018 re-zoning ordinance, and the City's alleged selective enforcement of its building code. But those activities fell solely within the City's purview and didn't implicate the Port or 3CDC. Beyond that deficiency, the Port's alleged reliance on "City expedited tax foreclosures to acquire properties," (Doc. 1, #28), doesn't show that the City and the Port functioned as a "continuing unit" for civil RICO purposes. Nor does 3CDC acting as a receiver for Port-acquired properties establish an association-in-fact enterprise. In other words, Plaintiffs' allegations, at most, suggest no more than a "routine business relationship" among these entities. *Smith v. Nationstar Mortg.*, No. 1:17-cv-1483,

48

2017 WL 6594009, at *4 (N.D. Ohio Dec. 21, 2017), *aff'd sub nom. Smith v. Nationstar Mortg., LLC*, 756 F. App'x 532 (6th Cir. 2018). And that is not enough to establish a civil RICO enterprise. *Id.* What's more, none of the nine Plaintiffs' individual allegations even mention the Port or 3CDC, much less establish that an "enterprise" consisting of the City, the Port, and 3CDC in any way impacted their properties. Because the Court finds that Plaintiffs failed to adequately allege an enterprise, their civil RICO claim fails. The Court, therefore, need not consider the "pattern" or "racketeering activity" elements.

### CONCLUSION

For the reasons explained above, the Court **GRANTS** the Moving Defendants' Motions to Dismiss (Docs. 83, 84, 86). Specifically, it **DISMISSES** Sparks', Hill's, and Thompson's claims against the Moving Defendants **WITH PREJUDICE**, and it **DISMISSES** Akil Childress's, Omar Childress's, Long's, Berkhalter's, Poole's, McCrary's, and Allen's claims against the Moving Defendants **WITHOUT PREJUDICE**.[27] Based on that, the Court **DIRECTS** the Clerk to terminate from the docket all Defendants, with the exception of Defendants Driehaus, Reese, Dumas, Schiller, Dusty Rhodes, Hern, Fehn, Minihan, James, David Schneider, Longhom, Ice, and "Other Unnamed Building Inspectors." The Court will determine the status

---

[27] Because Akil Childress's, Omar Childress's, Long's, Berkhalter's, and Poole's claims suffer from factual shortcomings they could potentially remedy (assuming the facts allow), the Court dismisses their claims without prejudice. And because the Court does not reach the merits of McCrary's and Allen's claims (which *Rooker-Feldman* and *Younger* bar, respectively), the Court likewise dismisses their claims without prejudice. But this Opinion and Order is preclusive of McCrary's and Allen's ability to reraise their claims in federal court.

of these remaining Defendants after it has had an opportunity to discuss the matter

with the parties.

     **SO ORDERED.**

February 10, 2025
_____
**DATE**

                              _____
                              **DOUGLAS R. COLE**
                              **UNITED STATES DISTRICT JUDGE**